UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

_____

In re:

      MARK A. KELLY                           Chapter 11
                                          Case No. 18-60514

                        and

      VANESSA C. KELLY

                          *Debtors.*

_____

APPEARANCES:

Hodgson Russ LLP                       *Richard L. Weisz, Esq. Counsel for*
                                          *Debtors*

677 Broadway
Albany, NY 12207

U.S. Department of Justice
Tax Division
POB 55-Ben Franklin Station           *Thelma Alejandra Lizama, Esq.*
Washington, DC 20044                 *Counsel for Creditor the United*
                                      *States of America (Internal Revenue*
                                      *Service)*

Honorable Diane Davis, Chief U.S. Bankruptcy Judge


**MEMORANDUM-DECISION AND ORDER**

       This matter is before the Court following a bench trial on Debtors', Mark A. Kelly ("Mr.

Kelly") and Vanessa C. Kelly ("Mrs. Kelly"), objection to the claim ("Objection to Claim") of the

Internal Revenue Service of the United States of America (the "IRS"). On May 25, 2018, the IRS

filed its initial Proof of Claim (Claim No. 8-1) that included a secured claim in the amount of

$1,644,099.14, a priority claim in the amount of $2,168,618.18, and a general unsecured claim of

$14,079.73, for a total amount of $3,826,797.05. Debtors filed their Objection to Claim No.#8-1

pursuant to 11 U.S.C. § 502 and Federal Rule of Bankruptcy Procedure 3007. On November 30,

2018, the IRS filed an amended Proof of Claim (Claim No. 8-4) that included a secured claim in the amount of $1,644,099.14, a priority claim in the amount of $1,991,591.28, and a general unsecured claim of $727,341.63, for a total amount of $4,363,032.05.

The IRS filed a response to Debtors' Objection on December 10, 2018 (the "Response," ECF No. 63).  Because Debtors' 2013 amended 1040 tax return was under examination, Debtors did not file for tax returns for subsequent years until the audit closed. For this reason, the IRS amended its proof of claim multiple times and finally on February 22, 2019 to reflect amended Claim No. 8-5 with $1,644,099.14 in secured claims, $1,997,716.48 in unsecured priority claims, and $727,341.63 in general unsecured claims (Claim No. 8-5).  After numerous adjournments, this matter was heard virtually by Zoom for Government on March 16, 2021 (the "Hearing").[1] At the close of evidence, the Court requested the parties to submit post-trial briefs, which they did simultaneously on May 3, 2021 (ECF No. 166 and 167).  At that time the matter was taken under advisement.  After consideration of the parties' written submissions and arguments, the Court now makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over the subject matter and parties of this contested matter pursuant to 11 U.S.C. § 502 and § 505(a)(1), 28 U.S.C. §§ 1334(a), 1334(b), 157(a), and 157(b)(2)(B).

---

[1] The original notice of hearing set the matter to be heard on November 14, 2018. (ECF No. 50). Both parties requested adjournments for various reasons, including discovery matters, scheduling conflicts, and the shutdown of the federal government for lack of funding in December 2018. Thereafter, the Covid-19 pandemic necessitated the federal court system to convert to a virtual court platform.  For these reasons, the scheduling order was amended three times with no objection from either party.  The virtual court platform utilized for the Hearing allowed participation by the attorneys in real time.  The format was not objected to by either party.

## ARGUMENTS

Debtors claim they are owed a refund in the amount of $64.00 for tax year 2013, a refund in the amount of $4,762.00 for 2016, and a tentative refund in the amount of $1,347,250.00. Debtors argue that because they made capital contributions to the company, their tax basis in the company and their ability to claim certain deductions were preserved. Debtors further contend that after the IRS completes its examination of the company's 2013 amended tax return, either no taxes will be due or, at the most, only $75,000 will be due as the tentative refund will cover all post 2013 taxes. For these reasons, Debtors ask this Court to disallow the IRS's proof of claim to the extent it exceeds tax obligations due.

Debtors also argue that they were insolvent when the company's secured lender took possession of and sold the company pursuant to an Article 9 Sale of the Uniform Commercial Code (the "Article 9 Sale"). Debtors claim that because they were insolvent at that time, they were relieved of any obligation to pay the IRS on cancelled debt resulting from the sale of that company.

The IRS argues Debtors failed to overcome the presumption of validity and correctness of its proof of claim because they failed to provide sufficient information to support their claim that no taxes are due. Further, the IRS contends that the significant losses incurred by the company eliminated any tax basis Debtors had in the company, thus negating their right to the deductions claimed on their personal tax returns. Finally, because the IRS has now completed its examination of Debtors' 2012 and 2013 tax returns, the IRS asks this Court to allow the proof of claim as filed.

## FACTS

There are two issues before the Court.  First, whether Debtors are entitled to claim certain tax deductions, and the resulting tax refunds, related to their tax basis in a limited liability company

that they owned and which incurred significant losses for the fiscal years relevant to an IRS audit of Debtors' personal tax returns. Second, whether Debtors were insolvent at the time the secured lender took possession of their company, thus relieving them of any tax obligations due to the cancellation of debtor related to the Article 9 Sale of their former company. The facts of the matter are highly disputed. Therefore, the Court's ruling is predicated on the evidentiary record which consists of the testimony elicited by both sides from three witnesses and documentary evidence. For the reasons set forth below, Debtors' Objection to Claim is denied.

By way of background, Debtors owned multiple companies, including but not limited to VMR Electronics, LLC ("VMR") and VMR Realty Management, LLC (VMR Realty), each of which experienced financial difficulties. Tr. 61. VMR had a number of loans with NBT Bank (the "Bank") that were secured with a blanket lien on all of Debtors' assets and businesses. Tr. 25. In early 2013 the IRS began an audit of VMR's 2011 tax return based on a tentative refund issued in the amount of approximately $2.8 million dollars. Tr. 21-22. By April 2013, however, the Bank had taken control of VMR's assets (Tr. 15) and enforced its rights through the Article 9 Sale in June 2013 (IRS' Exhibit 3). In consideration of Debtors' cooperation in completing the sale, Debtors entered into a forbearance agreement with the Bank dated June 18, 2013. This agreement released the personal guaranty of Mrs. Kelly and limited Mr. Kelly's personal guaranty to $2,707,100.00. (IRS' Exhibit 6). Thereafter, all of VMR's assets were sold as a going concern to an unrelated third party named VMR Electronics Corporation. (Debtors' Exhibit 14).

At the Hearing, Debtors' counsel called both Debtors as witnesses and offered 48 exhibits into evidence. On direct examination, Mr. Kelly testified that after studying computer science for one year at a junior college, he went to work for a small electronics distributor in 1978. Tr. 8-9. He started at the bottom and by 1986, he was running the division and oversaw about six or seven

divisions in the Northeast.  Tr. 9. The company primarily served as a distributor to the department

of defense. *Id.* Thereafter, he moved to Philadelphia and ran that division.  *Id.* After working for

the company for 16 years, Mr. Kelly purchased a manufacturer's representative firm, Fountain

Young & Company, and moved to Syracuse, New York in 1994.  Tr. 9-10. He worked at that firm

until he started VMR in 2001.  Tr. 10. VMR served as a real estate holding company for a building

located at 137 Washington Avenue in the Binghamton area.  *Id.* He and Mrs. Kelly were the sole

owners of VMR with ownership interests of at 49 % and 51% respectively. *Id.*

In 2005, VMR received an order for slightly less than $10,000,000.00 and it started

building cable assemblies for the Syracuse Research Corporation.  Tr. 11-12.  The order was for

IED jammers[2] and was considered a high priority for national defense.  Tr. 11. Mr. Kelly testified

that he later secured patents for his antenna cable designs utilized by the IED jammers. Tr. 12. By

mid-2006, the company had grown significantly, requiring Debtors to purchase a 22,000 square

foot facility located at 811 North Street.  *Id.* By the end of 2009, VMR had 280 employees and

generated $45,000,000.00 in revenue, and by the beginning of 2010 it was generating

$46,000,000.00 in revenue.  *Id.* VMR's accounting records were maintained by its then chief

financial officer, a Certified Public Accountant, who had the records certified by an outside firm

of Certified Public Accountants annually.  Tr. 42.

In 2010, when the government funding for IED jammers evaporated, the military

significantly reduced purchasing them from VMR. As a result, VMR had difficulty obtaining

financing and began to struggle financially. Tr. 14. Mr. Kelly testified that in order to maintain

operations, Debtors began using their own funds to provide the needed cash flow to operate VMR.

---

[2] IED jammers are devices that emit electromagnetic waves to create interference on frequencies used by remote controlled detonation and improvised explosive devices.

Between 2009 and 2010 Debtors "funded in millions" from royalties received from his patent. In 2012, they used funds from their retirement accounts, credit cards and by taking out a home equity line on their home, and by early 2013, Debtors used an additional $203,000.00 in personal funds to pay VMR vendors. *Id.* Despite these financial infusions into VMR, which Mr. Kelly testified totaled approximately $700,000.00, the Bank took possession of VMR and placed an agent onsite who then took possession of the company's assets and checking accounts. Tr. 14-15. Mr. Kelly also testified that any business transactions made during this time were not entered into VMR's accounting system. Tr. 23. After the Article 9 Sale, Mr. Kelly stayed on as an employee of subsequent owners. Tr. 16.

Also in early 2013, the IRS began an onsite audit of VMR's 2011 tax return, at which time Mr. Kelly retained attorneys and Certified Public Accountants who communicated directly with the IRS on Mr. Kelly's behalf. Tr. 21. According to Mr. Kelly, VMR provided numerous documents to the IRS, which were "enough to fill a pallet." Tr. 22. At the request of the IRS, Mr. Kelly contacted VMR's creditors to determine which accounts payable had been paid and which remained outstanding. Tr. 23. Most vendors did not respond. Tr. 23-24. According to Mr. Kelly, VMR paid down accounts payable to approximately $3.1 million dollars, but because business transactions were not entered after the Bank took possession, the accounts payable appeared to be $4.8 million dollars. Tr. 24. Mr. Kelly testified that he provided Mr. Simiele, the tax auditor assigned to his case, a spreadsheet of said expenditures. Tr. 24. At the hearing Mr. Kelly testified that they had "documentation for each supplier." *Id.*

It was also Mr. Kelly's position that, as of April 2013 when the Bank took possession of VMR and Debtors' other businesses, VMR's assets did not cover the company's liabilities and Debtors were left with just their home, which was also underwater. Tr. 25. Mr. Kelly testified that

because the Bank was in possession of everything, Debtors no longer owned any of the businesses and were insolvent. *Id.*

At the request of the IRS, Mr. Kelly also prepared a statement of the Kelly's personal assets in 2013, for which he claimed to have "backups for." Tr. 26. Mr. Kelly then proceeded to testify to some of the exhibits presented into evidence including valuations of real property and certain personal property, selected bank account statements, and copies of their 401K accounts, to demonstrate that Debtors were insolvent by over $6 million dollars. Tr. 26-34.  (Exhibits 29-42). Mr. Kelly testified that as amended, their personal financial statement dated June 1, 2013, accurately describes Debtors' personal finances in support of Mr. Kelly's testimony that they were insolvent by approximately $6,875,221.25 in 2013. Tr. 26. (Debtors' Exhibit 13).

Before turning to Mr. Kelly's unsigned Form 1045 application for a tentative refund, as well as the IRS' signed exhibit of the same (Debtors' Exhibit 6) (Creditor's Exhibit 2), although Attorney Weisz alluded to Exhibit 14 the Article 9 Bill of Sale he did so without eliciting any testimony concerning the same (Exhibit 14).[3] Mr. Kelly then testified that he dropped off Debtors' signed Form 1045 with an Agent Kim at the IRS Binghamton Office, along with various other returns. Tr. 36. Although both Form 1045 copies were dated October 3, 2013 by Debtors' certified public account, only the IRS' copy contained Debtors' signatures and was dated April 13, 2015. Mr. Kelly also testified that just before the Bank took over VMR, an agreement was made that creditors would receive all but $400,000.00 of the 1045 refund to pay for some of VMR's liabilities. Tr. 36-37. (IRS' Exhibit 2). Debtors never heard from Agent Kim or anyone else from the IRS until April 13, 2015, when Mr. Simiele called asking for a copy of their Form 1045; Mr.

---

[3] Debtor's Exhibit 14, titled Secured Creditor's Bill of Sale, includes an itemized list of VMR's personal property that was conveyed from the Bank to the buyer for $10, and other good and valuable consideration.

Kelly indicated he had only an unsigned copy of it on his computer. Tr. 37. According to Mr. Kelly, on April 13, 2015 Mr. Simiele requested Debtors sign and mail Form 1045 to him. Tr. 37-38. Mr. Kelly testified he did not have an original copy of his own due to the company's takeover, and emails being channeled only to the purchaser's representatives.  He testified that he did not hear back from the IRS about a refund until 2018, when Debtors filed for chapter 11 relief. Tr. 38-39. Mr. Kelly testified that the Form 1045 shows a decrease in tax of $1,347,250.00 at line 27, which Debtors list as the refund to Debtors in their petition. *Id*.  Debtors were surprised to receive a notice of deficiency from Agent Simiele in 2018, charging Debtors with cancellation of indebtedness. Tr. 34.

At the request of Mr. Simiele, Debtors had a local certified public accountant, prepare a summary of Debtors' basis assets and liabilities. Tr. 40. In support of the same, Mr. Kelly testified that Debtors provided the accountant with VMR's, VMR Realty's and all personal tax returns from 2001 forward and that the accountant used this information to prepare the summary chart that serves as Debtors' tax basis.[4] Tr. 40-41.  (Debtors' Exhibit 5). Mr. Kelly testified that he was never involved in maintaining VMR's business records personally because the in-house accountant and accounting firms took care of everything. Tr. 42 According to Mr. Kelly, he just signed the prepared tax returns prepared. Id.

Mr. Kelly then turned his attention to Exhibit 12 which includes two documents, namely a chart titled Capital Contributions to VMR Electronics in February and March 2013, listing a total amount of $203,582.76 (Tr. 44). Second, the exhibit also includes a two-page bank account

---

[4] The IRS objected to this document as hearsay. In response, Debtors' attorney questioned Mr. Kelly, who answered in the affirmative, that the tax returns reviewed by the accountant in preparation of Exhibit 5, were records maintained by accountants for the VMR in the ordinary course. The IRS responded that the chart was created for purposes of this hearing and, as such, was the accountant's interpretation of business records kept in the ordinary course. The Court reserved on and has addressed the objection at supra page 13.

statement for the period of February 5, 2013 through March 4, 2013. Attorney Weisz indicated that these documents demonstrate Debtors funded in an additional $131,580.43 to VMR for materials. Tr. 45-46. (Debtors' Exhibit 12). Mr. Kelly also testified that Exhibit 15 titled "Tax Asset Detail 1/1/12-12/31/12" and dated October 4, 2014, was a report prepared by VMR's on-staff certified public account for the 2012 tax filing year, as was Exhibit 16, which shows a comparison of 2012 and 2013 on Form 1065. Tr. 47-48. (Debtors' Exhibits 15 and 16).[5] Mr. Kelly then identified numerous exhibits, which were admitted with little or no testimony or objection by the IRS, other than Exhibit 15, to which the IRS also objected to as hearsay. Tr. 47-52.

On cross examination, the IRS asked Mr. Kelly various questions regarding VMR's Form 1065 Tax Return for 2012, including whether VMR had an increase of $5 million dollars and other depreciable assets. Mr. Kelly responded VMR did acquire assets but not "$5 million worth of buildings", such that he identified Schedule L Line 9A, titled Buildings and other Depreciable Assets, as an increase in depreciation. Tr. 53-55. (Debtors' Exhibit 7). The IRS also questioned Mr. Kelly regarding Schedule L Line 19B, Mortgages, Notes, Bonds payable in 1 year or more, of the same return, noting a difference of $4 million dollars and asked whether VMR has borrowed that sum of money during that tax year. Tr. 55. Mr. Kelly responded that VMR incurred significant loans for equipment in 2011, which were recorded in 2012. Id. Finally, the IRS inquired whether the $2.8 million dollars in capital contributions listed on Schedule M-2 Line 2, Capital Contributed, came from the partners, to which Mr. Kelly testified the funds came from his patents and went straight into the company as cash contributions. Tr. 56. When questioned whether he reported the royalty income on Debtors' 2012 personal income tax return, Mr. Kelly testified that he was not

---

[5] The IRS objected to some entries on the bank account statement as having no supporting documentation of the asserted transfers made by Debtors to VMR. The Court again reserved. See supra at 13.

familiar enough to answer that question; he "just signed the prepared statement from the CPA." Tr. 56.

The IRS then questioned Mr. Kelly about the application for tentative refund, noting that on direct Mr. Kelly testified that he signed a copy and dropped it off at the Binghamton office with an IRS agent. Tr. 57. The IRS then asked Mr. Kelly whether he recalled being deposed on December 16, 2019, during which time Mr. Kelly answered under oath that the Form 1045 was e-filed," and that he had the original email. Id. Mr. Kelly confirmed that he did recall saying this. *Id.*

Next the IRS cross-examined Mr. Kelly concerning Debtors' Exhibit 11, titled Form 1065X Amended Return or Administrative Adjustment Request (AAR), Part III, Explanation of Changes to Items in Part I and Part II, which summary concluded that VMR experienced a total loss in 2013. Tr. 58.[6] While Mr. Kelly jockeyed over the Article 9 Sale being for $1.00 or $10.00, he ultimately testified that he was never paid anything, "never received a penny," and thus did not recall signing any verification to an interrogatory on or about October 24, 2019 wherein he stated he believed the NBT sale was for $2,707,100.00. Tr. 59. Mr. Kelly further testified that even if his recollection was refreshed with said interrogatories, he would not understand what it said because it was his position that he never received any money from the resulting sale and foreclosures. Tr. 60. When asked if he owned VMR Realty on June 1, 2013 Mr. Kelly admitted that "I owned it, but I didn't have access to it" because the Bank was in possession VMR and Instinctive Intuitive Design on June 1, 2013.  Tr. 63. Finally, when questioned about the number of personal bank accounts Debtors had on June 1, 2013, Mr. Kelly testified that they had additional accounts at the

---

[6] The summary explanation provided in this section states the "identifiable event that took place in 2013, left VMR with no recourse (illiquid and insolvent) other than to abandon its leasehold improvements and all other assets. The repossessed assets were sold by NBT under an Article 9 Sale for $1 in 2013 to Leonard Levie (Champlain Cable Corporation) thereby supporting the total loss in 2013." (Debtors' Exhibit 11).

Bank but that these accounts were not included on Exhibit 13, because they did not have any cash in them.  Tr. 64.

Debtors' counsel then called Ms.  Kelly as a witness; Ms. Kelly testified that although she was an owner of VMR and signed documents on behalf of the company, she did not participate in its operations or have an office at VMR's location.  Tr. 67-68.   The IRS did not cross-examine Mrs. Kelly.

The IRS called one witness to testify, James Simiele (Mr. Simiele), an Analyst Revenue Agent for the IRS and a Certified Public Accountant licensed in the State of New York.  The IRS also admitted six exhibits into evidence.   Tr. 70.  Mr. Simiele testified that in early 2013, he was assigned to audit VMR's 2011 tax return due to a claimed loss carryback to 2009.  Tr. 70–71. In February 2013, Mr. Simiele met with Mr. Kelly, two representatives of Mr. Kelly and VMR's business manager, to discuss the reason for the $10 million dollar loss claimed on VMR's 2011 tax return. Tr. 71-72 Mr. Kelly's explanation to Mr. Simiele was that the loss was due to the Bank no longer lending the company money. Tr. 72. Mr. Simiele testified that VMR's increase in losses would have passed through to Mr. Kelly, which would have reduced the tax basis Mr. Kelly claimed for that tax year. Tr. 72. Debtors knew this and carried the 2011 loss back to 2009, which resulted in Mr. Kelly receiving the tentative refund of $2.8 million dollars. *Id.* Mr. Simiele testified that after conducting the audit, the previously issued tentative, $2.8 million dollar refund was reduced by the IRS. Tr. 73.

Mr. Simiele also examined VMR's 2012 tax return regarding an increase in assets and liabilities of $5 million dollars.  Tr. 73. He testified that this increase was considered questionable because the IRS knew VMR was in financial distress and having difficulties obtaining credit. *Id.* Mr. Simiele also testified that the loss claimed on VMR's 2011 tax return would have reduced

Debtors' tax basis in VMR for the following tax years.  Tr. 74. During the audit, Mr. Simiele

researched the agency's records for tax transcripts of Debtors' personal tax returns, but found that

none existed for 2012 and 2013. Tr. 74-75. Instead, it was not until he received a copy of Debtors'

2012 Form 1045 Application for Tentative Refund by mail on April 21, 2015 that he saw a copy

of Debtors' personal tax return for 2012 for the first time.  Tr. 75. Mr. Simiele testified that Form

1045 is a request for a tentative refund, not a formal claim, and that such a request must be filed

with the IRS's service center within one year after the loss claimed was experienced. Tr. 75 – 76.

Because these requirements were not met, Mr. Simiele informed Mr. Kelly's representatives that

the form could not be accepted.  As Debtors' 2012 personal tax return likewise claimed a loss, Mr.

Simiele testified that he questioned whether Debtors had sufficient basis in VMR to claim the loss

due to VMR's reported increase in assets and liabilities for that year. Tr. 76.

Mr. Simiele then testified at length regarding his efforts to obtain documentation in support

of VMR's original 2013 tax return and the sale of VMR's assets.  Tr. 76-78. Although he requested

documents from VMR's representatives several times, he did not receive a response.  Tr. 77. The

IRS then summoned the Bank and only then was he provided with documents that included the

terms of the sale. *Id.* Mr. Simiele then attempted to establish which of VMR's debts had been paid

as the company wound down, but he was likewise unsuccessful in obtaining documentation

concerning the same.  Tr. 80.  Therefore, and based upon the information received, the IRS made

adjustments to VMR's 2013 tax return by adding $6,108,707.00 to gross income, primarily due to

the $5,699,273.00 in cancellation of debt income as a result of the sale of VMR (Debtors' Ex. 3).

Mr. Simiele testified that although VMR's 2013 tax return was later amended to increase the loss

claimed in the amount of $2.3 million dollars to about $20 million dollars, Debtors never amended

their personal tax returns to reflect the same.  Tr. 79.    Mr. Simiele acknowledged that while

Debtors invested personal funds into VMR, the millions in losses VMR incurred year after year would have eliminated Debtors' tax basis in VMR. Tr. 82. On cross-examination, in addition to being questioned about various possible scenarios, Mr. Simiele reiterated his previous testimony that Debtors failed to provide sufficient documentation to allow him to determine whether Debtors were insolvent when VMR's debts were cancelled in 2013. Tr. 85.

## ADMISSIBILITY

Preliminarily, the Court reserved on the admissibility of certain exhibits, and will address them here. The IRS objected to Debtors' Exhibit 5 and Exhibit 17 as hearsay, and that neither fell under any hearsay exception.[7] Debtors' Exhibit 5 and Exhibit 17 are charts concerning the tax basis of VMR and VMR Realty, respectively. Tr. 40, 61. Mr. Kelly testified that these exhibits were prepared by professionals in response to a request from the IRS who used VMR and VMR Realty records.[8] *Id.* Debtors ask the Court to overrule the IRS' objections because the IRS failed to object to them one week before the scheduled evidentiary hearing as required by this Court's Scheduling Order. Since adherence to the Court's Scheduling Order is critical to the Court controlling its docket, the Court now overrules these objections as untimely, will admit Debtors' Exhibit 5 and Exhibit 17, and will accord them their appropriate evidentiary weight. See *Kuzma v. City of Fort Myers*, 151 F. App'x 911, 915 (11th Cir. 2005).

## DISCUSSION

A bankruptcy court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to a tax, whether or not previously assessed. 11 U.S.C. § 505(a)(1). Section 505 is intended to protect "creditors from the dissipation of the estate's assets which could

---

[7] The IRS also objected to portions of Exhibit 12 as hearsay. In response, Mr. Kelly testified to information contained within those portions, and the remainder of Exhibit 12 was admitted without objection. Tr. 46.
[8] No evidence was provided regarding when Exhibits 5 and 17 were prepared.

result if the creditors were bound by a tax judgment which the debtor, due to his ailing financial condition, did not contest." *In re Nw. Beverage, Inc.*, 46 B.R. 631, 635 (Bankr. N.D. Ill. 1985); *City Vending of Muskogee, Inc. v. Oklahoma Tax Comm'n*, 898 F.2d 122, 125 (10th Cir. 1990); *In re New Haven Projects Ltd. Liab. Co.*, 225 F.3d 283, 288–89 (2d Cir. 2000). Such a determination of a Chapter 11 debtors' tax liability constitutes a core proceeding pursuant to 11 U.S.C. § 505(a)(1) and 28 U.S.C. § 157(b)(2)(B).  *In re Hunt*, 95 B.R. 442, 444 (Bankr. N.D. Tex. 1989). "The general rule is that if a matter falls within a bankruptcy court's "core" jurisdiction, then the court should decide it." *In re Indianapolis Downs, LLC*, 462 B.R. 104, 114 (Bankr. D. Del. 2011).

By way of their Objection to Claim, Debtors ask this Court to find that they do not owe taxes in the amount listed in Claim No. 8-5. Section 502(a) states that: "a claim or interest, proof of which is filed under section 501 of this title, is deemed allowed unless a party in interest ... objects." 11 U.S.C. § 502(a).  A proof of claim executed and filed in accordance with Federal Rules of Bankruptcy Procedure constitutes "prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). Debtors object to IRS Claim No. 8-5 for two reasons.  First, they claim a loss carry forward from VMR on their personal income taxes, asserting they had a sufficient tax basis to do so, and further that they timely filed their tax returns.   Second, they contend that they are not required to pay income tax on VMR's cancelled debt for the 2013 tax year, because they were insolvent at the time of the Article 9 Sale.

IRS tax assessments have "the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong." *Welch v. Helvering*, 290 U.S. 111, 115 (1933).  Pursuant to the Internal Revenue Code ("IRC"), the burden shifts to the IRS after the taxpayer produces credible evidence in any court proceeding with respect to any relevant factual issue but only if "the taxpayer … complied with the requirements under this title to substantiate any item" on the tax

return, "the taxpayer … maintained all records required under this title and …[and] cooperated with reasonable requests... for witnesses, information, documents, meetings and interviews…" 26 U.S.C. § 7491(a)(1) and (2).  With this standard in mind, the Court now addresses the parties' arguments regarding tax years 2012 and 2013.

**Loss Carry Over**

The Supreme Court has long held that "an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer." *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992), *citing Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 593 (1943); *Deputy v. Du Pont*, 308 U.S. 488, 493 (1940); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934).  "In general, the taxpayer bears the burden of establishing both the actual existence of net operating losses in the prior years and the amount of such losses that may be carried to the years at issue." *Keith v. Comm'r*, 115 T.C. 605, 621 (2000).

"Taxpayers bear the burden of substantiating their claimed deductions by keeping and producing records sufficient to enable the Commissioner to determine the correct tax liability." *Wienke v. Comm'r*, 120 T.C.M. (CCH) 263 (2020).  Taxpayers are required to retain "books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return... and shall be retained so long as the contents thereof may become material in the administration of any internal revenue law." 26 C.F.R. § 1.6001-1.  The tax returns themselves are statements of the taxpayer's claims, but they "are not considered evidence of the claims themselves." *Wienke*, 120 T.C.M. (CCH) at 263. In *Jones v. Commissioner*, the Tax Court specifically ruled that it is insufficient for a taxpayer to attempt to substantiate a claimed loss carry over solely by providing the tax returns that have been challenged by the Internal Revenue Service. *Jones v. Comm'r*, 25

T.C. 1100, 1104 (1956), *rev'd. on other grounds* 259 F.2d 300 (5th Cir.1958).  As such, tax returns standing alone "are inadequate to sustain the petitioners' burden of proof in this case." *Id.* at 1103.

Debtors acknowledge that the burden is on them as taxpayers to prove, by a preponderance of evidence, that the assessment of the Internal Revenue Service is incorrect, citing *Welch v. Helvering*.  290 U.S. 111, 115 (1933).  *See also Timmins v. Comm'r*, 113 T.C.M. (CCH) 1412 (2017).

Debtors argue, however, that the burden shifted to the IRS when they presented credible evidence and provided substantiating records pursuant to 26 U.S.C. § 7491(a)(1) and (2) to substantiate their Objection to Claim.  In support of their position, Debtors admitted into evidence the following records pertaining to the claimed losses of VMR: 2012 Form 1065 U.S. Return of Partnership Income (Exhibit 7), 2013 Form 1065 U.S. Return of Partnership Income (Exhibit 10), 2013 Form 1065X Amended Return or Administrative Adjustment Request (Exhibit 11), and an itemized list of expenditures in support of their 2012 and 2013 Form 1065 (Exhibit 16).[9]  By themselves, these tax returns and supporting lists are insufficient to substantiate the losses claimed by VMR in 2013.  *Jones*, 25 T.C. at 1104.

Debtors also claimed deductions on their personal tax obligations based on VMR's losses. It was Debtors' obligation to retain documentation sufficient to support the losses claimed. Although Mr. Kelly repeatedly testified that VMR maintained the contemporaneous accounting records prepared by professionals, Debtors themselves were required to retain copies of said contemporaneous documentation to be able to substantiate the deductions taken and resulting

---

[9] Several of the documents and tax returns admitted by the Debtors were signed and dated years after they were due, raising questions regarding Debtors' ability to claim certain income tax deductions and refunds.

claimed losses on their personal tax returns.   Because Debtors failed to do so, the burden did not shift to the IRS in this case.

Likewise, Debtors were obligated to retain records from VMR to be able to substantiate their tax basis claimed for the years in issue.   Debtors however only submitted copies of their personal tax returns, assorted but not all bank statements for the period in question, and charts prepared in preparation of this hearing.   They did not elicit testimony from the individual who interpreted various documents and prepared the charts for the Hearing.   Because Debtors have not met the threshold requirement of maintaining adequate records, the Court need not consider whether Debtors had sufficient tax basis in VMR to claim the losses. Finally, although Mr. Kelly testified that he personally delivered the Form 1045 to an Internal Revenue Service agent in Binghamton, there is nothing in evidence to document or support this assertion, other than his testimony.   Critically, Mr. Simiele testified that the form had to have been filed within one year of loss and that it had to have been filed with the service center.   Because this was not done and in light of Mr. Kelly's many years of business experience, the Court discounts his testimony that he timely filed Form 1045.   Accordingly, this Court finds that Debtors have failed to sustain their burden to overcome the correctness and accuracy of Claim No. 8-5.   As such, the Court now turns its attention to Debtor's assertion regarding cancellation of debt income.

**Cancellation of Debt Income**

The Internal Revenue Code provides that "gross income means all income from whatever source derived." 26 U.S.C. § 61(a). This definition has been broadly construed by the Supreme Court "in recognition of the intention of Congress to tax all gains except those specifically exempted." *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 430 (1955). Similarly, the Supreme Court has narrowly construed exclusions to income.  See *Comm'r v. Jacobson*, 336 U.S. 28, 49

(1949); *United States v. Centennial Savings Bank FSB*, 499 U.S. 573, 583–84 (1991). The burden

is on the taxpayer to prove that an exclusion from income tax applies.  *See Galligan v. Comm'r*,

66 T.C.M. (CCH) 1669, 1671 (1993); *Gunderson v. Comm'r*, 38 T.C.M. (CCH) 464, 465 (1979);

*Anderson v. Comm'r*, 38 T.C.M. (CCH) 1206 (1979).

Gross income does not include debt cancellation income if the discharge occurs when the

taxpayer is insolvent. 11 U.S.C. § 108(a)(1).  The Tax Court has ruled on the nature and type of

documentation necessary for a taxpayer to meet the burden of proving an exclusion from debt

cancellation income tax due to insolvency.[10]  See *Ward v. Comm'r*, T.C.M. (RIA) 2021-032

(2021). A taxpayer cannot simply testify about their debts and assets without more.  Instead,

account statements regarding both must be provided for the time period immediately preceding the

cancellation of debt.  *Id.*  Further, written statements prepared by the taxpayer are also insufficient;

the statements must have been prepared by third parties, such as mortgagees or student-loan

lenders.  *Id.* Here, Debtors' testimony and exhibits alone are inadequate to support their assertion

that they were insolvent immediately preceding the Article 9 Sale.

In addition, while ownership of collateral after seizure by a secured creditor is frequently

litigated, the United States Supreme Court found in 1983 that debtors in bankruptcy continue to

own property after a pre-petition seizure pursuant to an IRS tax lien. *United States v. Whiting

Pools, Inc.*, 462 U.S. 198, 211 (1983).  The Supreme Court found that "[o]wnership of the property

is transferred only when the property is sold to a bona fide purchaser ...." *Id.* at 211.  Since then,

Courts have applied the reasoning of *Whiting Pools* to interpret statutes other than the IRC.  The

---

[10] The type of documentation needed varies depending upon the debts and assets at issue, but typically will include documents prepared by third parties, such as a mortgage company, for the period immediately before a debt is discharged.  To determine insolvency, all debts and assets must be substantiated.  *Ward v. Comm'r of Internal Revenue*, T.C.M. (RIA) 2021-032 (T.C. 2021).

Bankruptcy Court for the Western District of Oklahoma applied the reasoning of *Whiting Pools* to sales pursuant to Article 9 of the Uniform Commercial Code.  *In re Robinson,* 285 B.R. 732, 737 (Bankr. W.D. Okla. 2002).   Specifically, the court in *Robinson* held that a debtor retained ownership even after collateral was repossessed, "as it is only upon consummation of a disposition sale of the collateral that all of the debtor's rights in the collateral are transferred and the security interest is discharged." *Id.*

Although Mr. Kelly testified that he ceased to own VMR because the Bank took possession in April 2013, the documentary evidence demonstrates otherwise.  First, the Agreement Regarding guaranty of NBT Indebtedness (IRS' Ex. 3) dated June 18, 2013 concerns the <u>pending</u> sale of VMR's assets from the Bank to the prospective purchaser. Second, the Secured Creditor's Bill of Sale (Debtors' Ex. 14) dated June 28, 2013 provides that, in consideration of Debtors' cooperation in the sale, Mr. Kelly's liability to the Bank was reduced to $2,707,100, without recourse, and Mrs. Kelly's and Fountain Young's liability was extinguished.  Although the Bill of Sale suggests that the consideration was for $10.00, which amount Mr. Kelly claims is evidence of their insolvency, Debtors continued to own VMR up until the Article 9 Sale occurred on June 28, 2013. Further, the value of VMR's assets must be considered in determining whether Debtors were in fact insolvent in 2013.  The record reflects however, that on at least two occasions the business had value.  First, the third-party purchaser financed $2,707,100.00 to acquire VMR, subject to secured claims, which demonstrates that VMR had some value.  Second, VMR's amended 2013 tax return claims the "total loss" amount of $16 million dollars which also indicates that the value of VMR's assets may have been substantial.   Debtors further contend that VMR's amended 2013 tax return demonstrates that Debtors "abandoned" VMR's assets, and that they were thus insolvent. This assertion is not supported by the evidence or the testimony provided.

Here, and in contrast to Mr. Kelly's testimony, the record shows that Debtors' owned VMR until it was sold as a going concern. (IRS' Ex. 3 and Debtors' Ex. 14).  In addition, the value of the assets sold in VMR's Article 9 Sale must be considered in determining whether Debtors were insolvent before the sale occurred. Although Debtors owned additional companies, including Distinct Intuitive Designs, LLC, Diamond Taurus Realty, LLC and Fountain Young & Company, LLC, these companies were not addressed in Debtors' insolvency analysis.  Similarly, although Debtors provided statements for some but not all their checking and retirement accounts; without supporting documentation of all of Debtors' assets and liabilities, the Court cannot determine whether Debtors were insolvent during the time in question.

It is Debtors' burden to prove whether Debtors were insolvent during the time in question. that they were insolvent in 2013. After considering all the evidence and testimony, the Court finds that Debtors have failed to carry their burden because they failed to maintain and provide sufficient documentation to shift the burden of proof to the IRS regarding Debtors' insolvency.

## **CONCLUSION**

For the foregoing reasons, Debtors' Objection to Claim is overruled, and the IRS Proof of Claim 8-5 as filed is allowed.

It is SO ORDERED.

Dated: December 14, 2021
      Utica, New York                   /s/ Diane Davis _____
                                      Hon. Diane Davis
                                      Chief U.S. Bankruptcy Judge